UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:23-cr-00191-SRC |
| | ) |
| ANTONE LITTLE, | ) |
| | ) |
| Defendant. | ) |

**<u>Sentencing Memorandum</u>**

In April 2023, the United States charged Antone Little with one count of felon in possession of a firearm pursuant to 18 U.S.C. § 922(g)(1), one count of possession with intent to distribute fentanyl pursuant to 21 U.S.C. § 841(a)(1), and one count of possession of a firearm in furtherance of a drug-trafficking crime pursuant to 18 U.S.C. § 924(c)(1)(A). Docs. 1–2. In June 2024, Little pleaded guilty to counts one and two—felon in possession of a firearm and possession with intent to distribute fentanyl, respectively—and, in exchange, the United States agreed to dismiss count three—the single count of possession of a firearm in furtherance of a drug-trafficking crime. Doc. 38 at 1;[1] *see also* docs. 1–2.

Thereafter, the United States Probation Office filed the presentence report, doc. 45, and, as relevant here, added four levels to Little's base offense level pursuant to United States Sentencing Guideline § 2D1.1(b)(13)(A), because Little "knowingly misrepresented as another substance a mixture or substance containing fentanyl," *id.* at ¶ 30. Little filed objections to the presentence report, including to the application of the four-level increase, doc. 51 at ¶ 1, and, in response, the United States argued in support of the enhancement, doc. 53 at 2–6.

---

[1] The Court cites to page numbers as assigned by CM/ECF.

At sentencing, the Court, among other things, heard testimony from Detective Logan Priddy and Little himself, and heard extensive argument on the issue of the four-level increase. *See* doc. 64. After considering the text of the applicable guideline, the parties' briefing on the issue and their cited authorities, *see* docs. 51, 53, the final presentence report, doc. 56, and the testimony and arguments at sentencing, the Court ultimately overruled Little's objection, determined that section § 2D1.1(b)(13)(A) applied, *see* doc. 64, and sentenced Little to 235 months' imprisonment (the lowest end of Little's guidelines range, after applying the enhancement) and three years' supervised release.

Also, the Court explained, following its lengthy oral ruling, that it would issue a written opinion to reassert—in a clearer and more fulsome way—the Court's findings as to the relative credibility of the testimony related to the application of the four-level increase and, specifically, the internal and external inconsistencies with Little's testimony. And so the Court begins by recounting some of the facts relevant to Little's objection and then concludes by more completely explaining its rationale for finding inconsistent Little's testimony, and finding that, on the facts of this case, the four-level increase pursuant to section § 2D1.1(b)(13)(A) applies.

**I.    Background**

Little's guilty plea agreement describes the following facts, among others, agreed to by the parties. Doc. 38 at 3–5. "On March 31, 2023, St. Louis Metropolitan Police Department . . . detectives executed a state level search warrant on the residences located at 5890 Kennerly Avenue Apartments A and B, in the City of St. Louis," Missouri. *Id.* "A search of . . . Apartment B revealed a large amount of suspected narcotic, two bags of empty capsules, a pill capper, a blender with white residue, a 9-millimeter semi-automatic pistol, an AR-12 Gauge shotgun, and a .45 Long Colt revolver in the front room." *Id.* Also, "[i]nside the living room

2

was a knotted plastic baggie containing a white powdery substance and three bags of empty capsules." *Id.* at 4.

Relevant here, "[i]nside [Little's] bedroom was a bag containing yellow oval pills packaged for distribution" and "a silver container with multi-colored pills." *Id.* at 3. Little "informed detectives that he purchased the yellow oval pills earlier that week for approximately" $1,000. *Id.* The St. Louis Metropolitan Police Department's "incident report . . . indicates that [Little] stated that the yellow oval pills were imitation Oxycodone pills laced with fentanyl and methamphetamine." *Id.*[2] "He further stated, '[h]ey if you are dumb enough to believe I am selling Oxycodone at this cheap of a price then you stupid as hell. If they overdose, then oh well. That is part of the game.'" *Id.* To be clear, Little "denies making the[se] statements." *Id.*; *see also* doc. 51 at ¶ 1 (objecting to certain paragraphs in the presentence report "relat[ing] to . . . knowingly misrepresenting fentanyl as another substance").

After laboratory analysis, the St. Louis Metropolitan Police Department "determined that one metal container contained . . . seventeen (17) knotted plastic bags contain[ed] a total of one thousand six hundred thirty-three (1,633) tablets weighing 854.24 grams of fentanyl, a Schedule 2 controlled substance[.]" Doc. 38 at 4. The St. Louis Metropolitan Police Department also determined that the "metal container contained one hundred one (101) multi-colored tablets weighting [sic] 26.93 grams of methamphetamine, a Schedule 2 controlled substance, . . . two knotted plastic bags containing 10.93 grams of fentanyl, a Schedule 2 controlled substance, one

---

[2] At sentencing, the parties used the terms "Oxycontin" and "oxycodone" nearly interchangeably. Based on the Court's research, it appears that the term "oxycodone" generally refers to an opioid pain medication, whereas the term "Oxycontin" refers to a specific, brand name of oxycodone. *See* MedLine Plus, *Oxycodone* (2025), https://medlineplus.gov/druginfo/meds/a682132.html#brand-name-1. To be clear, the parties have not clarified or defined these terms on the record. Therefore, for purposes of this sentencing memorandum, the Court uses the terms interchangeably—typically adopting the term that a party used in that given portion of the testimony—and without reference to the technical meanings of the terms. Also, if a document filed in this case used one term or the other, and the Court quotes that document, the Court does not modify that usage of the term(s).

3

knotted plastic bag containing .21 grams of cocaine, a Schedule 2 controlled substance, one capsule containing .0015 grams of alprazolam, a Schedule 4 controlled substance," and "one knotted plastic bag containing 2.57 grams of fentanyl, a Schedule 2 controlled substance." *Id.* at 4–5.  Further, Little "admit[ted that] he intended to distribute some or all of the fentanyl and other controlled substances to another person." *Id.* at 5.

More specifically, in his guilty plea agreement, and orally at the change-of-plea hearing, Little admitted to knowingly violating the following elements of possession with intent to distribute controlled substances:

> (i)   The defendant was in possession of a controlled substances;
>
> (ii)  The defendant knew that he was in possession of controlled substance drug; and
>
> (iii) The defendant intended to distribute some or all of the controlled substance to another person.

*Id.* at 3; *see also* doc. 37.  Importantly, those controlled substances to which Little admitted possessing with intent to distribute included the 1,633 fentanyl-laced and 101 methamphetamine-laced pills.  Doc. 38 at 4; *see also* doc. 37.

And lastly, of the three firearms that Little possessed at the time of his arrest, the "9 millimeter caliber, semi-automatic pistol[] . . . contain[ed] 13 rounds of ammunition," the ".45 Long Colt/ .410 Gauge caliber, revolver pistol[] . . . [was] loaded with 5 round[s] of ammunition," and the "12 Gauge, semi-automatic shotgun[] . . . [was] loaded with 10 rounds of ammunition."  Doc. 38 at 5.

**II.     Standard**

Pursuant to section § 2D1.1(b)(13), "[i]f the defendant . . . knowingly misrepresented or knowingly marketed as another substance a mixture or substance containing fentanyl . . . or a

4

fentanyl analogue," then the defendant's base offense level must "increase by 4 levels[.]" "The [United States] has the burden of proving facts supporting sentencing enhancements by a preponderance of the evidence." *United States v. Sawatzky*, 994 F.3d 919, 924 (8th Cir. 2021) (citing *United States v. Mannings*, 850 F.3d 404, 408 (8th Cir. 2017)).

Separately, as the Court explained at sentencing, "'[i]n resolving any . . . dispute concerning a factor important to the sentencing determination, [a] court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.'" *United States v. Richart*, 662 F.3d 1037, 1057 (8th Cir. 2011) (second alteration in original) (quoting *United States v. Pratt*, 553 F.3d 1165, 1170 (8th Cir. 2009)); *see* Fed. R. Evid. 1101(d) ("The[ Federal Rules of Evidence] . . . do not apply to . . . sentencing[.]"); U.S.S.G. § 6A1.3(a); *see also* 18 U.S.C. § 3661 (providing that "[n]o limitation shall be placed on the information" that "a court . . . may receive and consider for the purpose of imposing an appropriate sentence"). Sufficient reliability "'depends on the facts of the particular case, and is committed to the sound discretion of the district court.'" *Richart*, 662 F.3d at 1057 (quoting *United States v. Woods*, 596 F.3d 445, 448 (8th Cir. 2010)).

### III.    Discussion

In objecting to the application of the four-level increase in section § 2D1.1(b)(13)(A), Little argued that "[t]here is no evidence [that he] sold, marketed or misrepresented the yellow pills described in paragraph 18" of the presentence report and, therefore, "there is insufficient evidence to support the enhancement of knowingly misrepresenting or knowingly marketing the pills as another substance." Doc. 51 at ¶ 1. Little referenced numerous cases—which the Court discussed in its oral ruling at sentencing and analyzes below—to support his conclusion that,

5

because "there [wa]s no evidence [that he] marketed the sale of the pills" or that he "ever sold the pills at issue, . . . the enhancement should not" apply. *Id.*

In response, the United States argued that, "[b]ased on Little's own admission to law enforcement[,] he knew the yellow pills were imitation oxycodone and believed the pills were laced with fentanyl and methamphetamine." Doc. 53 at 2–3 (citing doc. 45 at ¶ 18). The United States also made clear that "[i]t is undisputed that Little possessed with the intent to sell 1,633 yellow tablets containing fentanyl." *Id.* at 2. Further, "[e]ven without Little's admission, the enhancement should apply[,]" the United States argued, because "[t]he drug identification report state[d] that the 1,633 round yellow pills were marked 'C <>230.'" *Id.* at 3. And because "[r]ound yellow pills with [an] imprint code or pill identifier of 'C 230' contain acetaminophen and oxycodone hydrochloride," "the pills 'were marketed and represented—as any other product would be deemed marketed as it is labeled once put into the stream of commerce—as prescription oxycodone hydrochloride.'" *Id.* (citations omitted).

The United States also conceded that "[t]his enhancement is a relatively new amendment to the Guidelines," and that "[t]here are no notes and minimal guidance on its application." *Id.* at 4. It went on to distinguish Little's cited authorities, rejecting the argument that "evidence of an actual sale of the pills" is "required, and concluded that the four-level increase should apply because "the round yellow pills in this case speak for themselves" and "Little stated [that] he knew the pills were imitation oxycodone and contained fentanyl." *Id.* at 5.

### A.     Authorities relied on by the parties

At sentencing, the Court analyzed and distinguished a handful of the parties' cited authorities. For clarity's sake, the Court recounts, in further detail, that analysis here.

6

In support of his objection to applying section § 2D1.1(b)(13)(A), Little relied on *United States v. Wiley*, 122 F.4th 725 (8th Cir. 2024), to argue that only a *sale* of the subject drugs would rise to the level of marketing needed to justify the four-level increase. *See* doc. 51 at ¶ 1. But *Wiley* does not require a "sale" of the drugs to apply the four-level increase. Instead, the Eighth Circuit highlighted the fact that the defendant "advertised his drugs by several names—'perks,' 'perk 30s,' and 'perk 30'—without any reference to the fentanyl in them." *Wiley*, 122 F.4th at 731. Also, "[s]everal witnesses confirmed [t]hat [the defendant] knew" that the drugs "were not legitimate Percocet prescription pills." *Id.*

In concluding that "[t]he district court did not err in applying" the same "four-level enhancement" at issue here, the court reasoned that, "[b]y advertising the pills as 'perks,' the accepted name for prescription Percocet, with the knowledge that they were not," the defendant "knowingly marketed a substance containing fentanyl as another substance." *Id.* Thus, based on *Wiley*, the Court need not analyze whether Little sold or attempted to sell the pills in question. Instead, to apply the four-level increase, application of the enhancement may turn on the question of *marketing* the pills, which, in *Wiley*, occurred by the defendant holding the drugs out online as something other than their real substance—i.e., fentanyl. *See id.*

Little also cursorily relied on *United States v. Allen*, No. 21-3900, 2022 WL 7980905 (6th Cir. 2022), an unpublished case from the Sixth Circuit, to support his necessity-of-a-sale theory, *see* doc. 51 at ¶ 1. Interestingly, the court in that case primarily focused on the defendant's knowledge—i.e., the *mens rea*—that the subject drugs contained fentanyl. *Allen*, 2022 WL 7980905, at *3. The court explained that "[t]he specific offense characteristic," referring to section § 2D1.1(b)(13), "'includes a *mens rea* requirement to ensure that only the

7

most culpable' are subjected to the enhancement." *Id.* (quoting U.S.S.G. supp. to app. C, amend. 807 (2021)).

Further, the court in *Allen* focused on two pieces of evidence: first, evidence that a "caller and another individual told one of the case agents [that] they had told [the defendant] directly that the heroin he was selling contained fentanyl"; and second, that the defendant "had a close relationship with the co-defendant who received the phone call[.]" *Id.* And so while acknowledging that "[t]he court [was] 'not restricted to information that would [have been] admissible at trial'" and instead could have "consider[ed] 'any' information, including hearsay, so long as it [was] sufficiently reliable[,]" the court pieced together those two pieces of evidence to conclude that the defendant's "testimony . . . that he had no idea there was fentanyl in the heroin he sold was unpersuasive." *Id.* (quoting U.S.S.G. § 6A1.3 cmt.).

Little also cited *United States v. Haynes*, No. 22-4738, 2024 WL 2206500 (4th Cir. 2024), an unpublished case out of the United States Court of Appeals for the Fourth Circuit, to support his assertion that "there [was] no evidence [that he] ever sold the pills at issue[.]" Doc. 51 at ¶ 1. But as the Court explained at sentencing, the *Haynes* decision did not cite to or analyze section § 2D1.1(b)(13)(A) and, moreover, *Haynes* contains no substantive discussion of whether the court actually dealt with a different enhancement. *See Haynes*, 2024 WL 2206500, at *1–*5.

To counter Little's objections, the United States, in addition to distinguishing the authorities cited by Little, primarily relied on *United States v. Marion*, 648 F. Supp. 3d 1048 (N.D. Ind. 2022). *See* doc. 53 at 3–4. *Marion* supports, the United States argued, that "[t]he [C 230] markings on each of the yellow pills marketed and represented that [they were]

8

oxycodone[,]" and that "Little knew that the markings represented oxycodone and that the pills actually contained fentanyl." Doc. 53 at 4.  "[T]hus the enhancement should apply." *Id.*

In *Marion*, the defendant stated that "he knew he was selling (and using) fentanyl but never misrepresented the substance he sold." 648 F. Supp. 3d at 1052.  The defendant, however, "knew how the pills were made" and "sold blue pills marked 'M/30'—a close match to the color and coding for prescription oxycodone or 'Perc 30s.'" *Id.* at 1052–53.  Thus, "[t]he very act of counterfeiting such pills as mimics to oxycodone, particularly when [the defendant] knew they were fentanyl, . . . qualifie[d] as a knowing misrepresentation on his part." *Id.* at 1053.

Therefore, the court in *Marion* applied the enhancement and reasoned that the pills "were marketed and represented—as any other product would be deemed marketed as it is labeled once put into the stream of commerce—as prescription oxycodone for months, though [the defendant] knew they were fentanyl." *Id.*  And so to put the United States's argument simply, the knowing possession of counterfeit pills with intent to distribute equates to marketing them for purposes of applying the four-level enhancement.  With this understanding in mind, the Court turns to the testimony at sentencing.

**B.    Little's testimony**

As context for the Court's evaluation of the credibility and veracity of Little's testimony, the Court emphasizes Little's altered state at the time of the search of his apartment.  After testifying that he took heroin before, and was under the influence of the heroin when, detectives searched his apartment (and while he conversed with detectives during the search), Little initially stated that using heroin did not alter his state of mind and, instead, only made him sleepy.  But then Little testified that using heroin gave his mind and body a "euphoria feeling" and that a lot of problems came with heroin use.  Overall, the Court found Little's testimony about the effects

9

of heroin on him inconsistent, not credible, and quite dodgy. Due to Little's altered state at the time of the events in question, and the external and internal inconsistencies with his testimony at sentencing, the Court found that Little's testimony lacked credibility and veracity, and accorded only a scintilla of weight to Little's attempts to exculpate himself regarding the enhancement.

### 1. External inconsistencies

As the Court explained at sentencing, Little's testimony conflicted multiple times with the testimony given by Detective Priddy, an officer involved in the investigation of Little and present during the execution of the search warrant at Little's apartment.

First off, when asked about his conversation with, and statements made to, an officer during the search, Little testified that, at that time, he had taken heroin and that the officer either switched around or misheard Little's statement. But Detective Priddy testified as to the accuracy, in the police report, of Little's statement that "'[h]ey if you are dumb enough to believe I am selling oxycodone at this cheap of a price then you stupid as hell. If they overdose, then oh well. That is part of the game.'" Doc. 45 at ¶ 18. As such, the Probation Office directly quoted that statement in the presentence report. *Id.* Likewise, Detective Priddy explained that, in the police report, Little's statement had quotation marks around it, which, in his experience, indicated that the statement was a direct quotation of a statement made by a suspect to a detective.

And second, Little testified that, when an officer opened the bag of pills during the search, Little responded that the pills looked like oxycontin. But at sentencing, Detective Priddy explained that, while searching Little's apartment, he heard Little refer to the round yellow pills as "China yellow." Detective Priddy found this reference odd because, although detectives

10

found yellow pills in Little's apartment, drug dealers typically use the term "China white" to refer to fentanyl or an opiate from China—not oxycontin as Little claimed the pills appeared.

As a result, the Court found at sentencing, and agrees here, as to the reliability and consistency of Detective Priddy's testimony, particularly due to his involvement in this investigation and the execution of the search warrant, his work with the lead detective, Detective Ryan Drago,[3] on the drug-enforcement-and-intervention unit, and Detective Priddy's involvement in hundreds of narcotic investigations. Moreover, the Court also found Detective Priddy's testimony internally consistent with all his testimony offered at sentencing and externally consistent with other evidence in the record, including the guilty plea agreement, doc. 38, and the police report about which he testified.

### 2. Internal inconsistencies

At nearly every turn, Little's testimony at sentencing appeared to tumble on itself.

First, as noted, Little admitted that he was under the influence of heroin at the time of the search. To a certain extent, Little's testimony was consistent with the effects of heroin on the human brain and body. *See* Nat'l Inst. on Drug Abuse, *What are the immediate (short-term) effects of heroin use?* (2021), https://nida.nih.gov/publications/research-reports/heroin/what-are-immediate-short-term-effects-heroin-use. Little testified about heroin making him both euphoric and sleepy, but Little did not acknowledge the known effects of heroin on mental and physiological functioning. *Id.* ("After the initial effects, [heroin] users usually will be drowsy for several hours; mental function is clouded; heart function slows; and breathing is also severely slowed . . . .").

---

[3] Detective Drago of the St. Louis Metropolitan Police Department did not testify at sentencing as he could not appear due to "military leave out of state." Doc. 54 at 2.

Second, Little initially testified that he told an officer during the search that the round yellow pills looked like oxycontin.  He also testified that he did not sell pharmaceutical drugs, like oxycodone pills, and that one oxycodone pill sells for $20, if not more.  But while the pills looked like oxycontin, Little also testified that he knew that, because of the high quantity of pills in the bag and based on his experience as a drug dealer, the pills were fake and not really oxycontin.  An average person, however, absent some sort of testing, would not necessarily know if the pills contained fentanyl as opposed to actually containing oxycontin.

Third, Little testified that he obtained the round yellow pills from a man, known to Little simply as "Kevin," who worked for the same temporary work service.  "Kevin," Little testified, found the pills in a vacant building and did not have anywhere to store the pills because "Kevin" did not have a place to stay.  So, Little testified, he did "Kevin" a favor by storing the pills.  But later on, Little changed his tune, testifying that it would make no sense for him to bring over $100,000' worth of drugs into his home where his family lives.  More confusing though, regardless of whether Little thought (or knew) that the pills were oxycontin or fentanyl, the Court finds his testimony about his familial concerns inconsistent with his testimony about the severe dangers and consequences of storing both drugs.  Specifically, Little testified about potential dangers to his family due to possessing drugs with such a substantial street value in his home.  Yet, he could not explain why he agreed to store the exorbitantly valued pills (or, at least, pills appearing to have a high street value) in his home other than as a favor for the seemingly chimerical "Kevin."

Also, as for "Kevin," Little made clear that he knew little to nothing about "Kevin's" life or background, did not know "Kevin's" last name, and only knew "Kevin" approximately eleven or twelve months before accepting the pills from him.  But Little's testimony, cementing an

12

infinitesimal-sized relationship between him and "Kevin," simply does not comport with Little's assertion that it would make no sense for him to bring a vast amount of drugs into his home and in such close proximity to his family.  Accepting all these dangers for, at best, a loose work colleague or, at worst, essentially a stranger, simply makes no sense, particularly given that "Kevin" "had no place to stay," which suggests that Little placed far greater importance on safekeeping the drugs than on the well-being of "Kevin."

Fourth, and further to the point, Little testified about the risks for "Kevin" potentially encountering law enforcement on the streets while in possession of the pills.  But Little's testimony failed to account for *him* taking the lion's share of the risk in the situation, not to mention that of his family, which the Court noted above.  Yet Little later made clear the large risk that anyone, including himself, would have while in possession of that quantity of pills.  And the undisputed evidence that Little had three loaded firearms in his apartment at the time of the search, doc. 38 at 3, underscores his knowledge of the risk of safeguarding illegal drugs.

Fifth, as stated in the presentence report, "Little advised detectives [that] he obtained [the] large quantity of yellow oval pills earlier that week and paid approximately $1,000 for them."  Doc. 45 at ¶ 18.  But at sentencing, when asked whether he recalled telling Detective Drago that he purchased the pills for $1,000, Little had absolutely no recollection of that statement.  His testimony, therefore, contradicts his statement in the presentence report, initially captured by detectives.  *Id.*

Sixth, as the Court mentioned above, Little pleaded guilty to one count of possession *with intent to distribute* fentanyl.  Yet when asked whether he intended on selling the round yellow pills, Little testified that he intended on giving the pills back to "Kevin" and had no intention of selling the pills himself.  Thus, Little's testimony simply did not track with his decision to plead

13

guilty to the count for possession with intent to distribute fentanyl or the conduct he admitted both in his guilty plea agreement and at his change-of-plea hearing.  *See* doc. 38; *see also* doc. 37.  Why plead guilty to that crime if you later claim that you had no intention of distributing fentanyl?  As the Court emphasized at sentencing, Little's testimony defied logic and sense.  Instead, his testimony stood out as an after-the-fact, post hoc rationalization to support his theory that, somehow, he did not intend to distribute the pills that he was storing at great risk to himself and his family in the name of safekeeping them for an at-best tenuous acquaintance.

Seventh, when asked how long he had sold drugs, Little testified "not long."  In the same breath, Little agreed that he had prior convictions for possession with the intent to distribute.  He also agreed that police arrested him and a court sentenced him in or around 2015 for possession with the intent to distribute cocaine base.  He also agreed that, at that time, he possessed heroin, and that he had other prior convictions for possession of heroin.  After this lengthy exchange, Little again testified "not long" when asked how long he had been selling drugs.

Eighth, on redirect, Little's attorney asked him whether the area that he lived in, the Wells-Goodfellow neighborhood, would typically have a strong client base for expensive pharmaceutical drugs, like oxycontin.  In response, Little testified "no."  He also testified that no one had ever asked him to sell oxycodone before, and that he never told anyone that he sold those kinds of controlled substances.  Yet a few moments later, when asked (by his own attorney—and seemingly not picking up on the point of his attorney's previous question) if he even knew who to sell those kinds of controlled substances to, Little readily responded "yes," and explained precisely the "clientele base" to whom he would sell the substances.  Thus, the Court found that Little's conflicting testimony on this point directly withered any probative value that his attorney attempted to garner regarding the purported lack of market for the controlled

14

substances. Moreover, Little's quick answer further undermined his testimony that he had not been a drug dealer for very long and sold drugs only to family and associates.

And ninth, Little's testimony about his customer base fared no better. At first, when asked how he obtained his customers, Little responded, "what customers?" But then, when pressed, Little testified that he sold drugs to "family and some associates." Thus, the Court found Little's testimony on these points particularly evasive and obscure—seemingly a gulf away from reliability or trustworthiness.

In the end, the Court finds that, given the known impacts of heroin on mental functioning and all of the inconsistencies in his testimony, Little's testimony about what he said, or claims not to have said, during the search, and what he claims did or did not happen during the search, simply lacks credibility. All the evidence in the entirety of the sentencing record, supported by Detective Priddy's trustworthy and reliable testimony, painted a clear picture that Little knowingly marketed as another substance the 1,633 pills containing fentanyl, necessitating the application of the four-level increase pursuant to section § 2D1.1(b)(13)(A). As the Court explained at sentencing and further explicates here, the totality of the circumstances and all the facts preponderate in favor of applying the four-level increase.

## IV.   Conclusion

Accordingly, for all the reasons stated in this sentencing memorandum and explained at sentencing, the Court overruled Little's objection and determined that the four-level increase under U.S.S.G. § 2D1.1(b)(13)(A) applied in this case.

So ordered this 14th day of March 2025.

SLR. CR
_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE